UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

    -v-                           CASE NO.  21-CR-138 (RAW)

DEVIN WARREN SIZEMORE,
                         Defendant.

---

# **<u>SENTENCING MEMORANDUM</u>**


Dated: September 22, 2023               Respectfully submitted,

                                      Lisa A. Peebles
                                      Federal Public Defender
                                      Bar Roll No. 507041
                                      Clinton Exchange, 3rd Floor
                                      4 Clinton Square
                                      Syracuse, New York 13202
                                      (315) 701-0080

## Introduction

A parent's worst nightmare is the death of a child. There is no greater loss. The grief is exacerbated exponentially if the parent is responsible.

In this case, Devin Sizemore feels responsible for the death of his daughter, Emily.[1] That reality haunts him every day. The person he loved more than anyone on Earth is gone forever because of his recklessness. At the time, Devin believed he was providing Emily with the love and protection she required. However, he was not operating within a normal mental capacity. Had he been, he never would have put Emily in that situation. There is no greater punishment for Devin than feeling responsible for his little girl's death.

A jury convicted Devin on April 11, 2023, of Voluntary Manslaughter and Child Abuse in Indian Country. Defense counsel submits this sentencing memorandum in support of a sentence of time served and three years' supervised release. He has been in custody since July 15, 2016 – more than seven years.[2] Although the sentencing guidelines recommend a sentence of at least twelve years, the defense maintains that a sentence of time served is warranted because the offense was the result of Devin's relative youth, diminished capacity, and mental illness.  Moreover, the guideline range itself is premised on an overstated criminal history.  What is more, although Devin does not technically qualify for a guideline

---

[1] Devin Sizemore does not concede that there was sufficient evidence to sustain a conviction on any of the counts alleged in the indictment.

[2] Assuming full good time credit, a sentence of time served from July 15, 2016 – now seven years and two months – would be equivalent to a sentence of 101 months.

1

reduction for acceptance of responsibility, he does acknowledge his role in the death of his daughter.[3] Finally, Devin has made considerable steps toward self-examination and rehabilitation. Far from presenting a danger of reoffending, Devin is prepared to take advantage of an opportunity to live a productive life in service to others.

## Procedural Background

A federal grand jury returned a six-count indictment on May 12, 2021.[4] Count One alleged Mr. Sizemore committed first-degree murder of his daughter, in violation of 18 U.S.C. §§ 1111(a), 1151, 1153. Count Two alleged second-degree murder of his daughter, in violation of the same provisions of Title 18.  Count Three alleged voluntary manslaughter in violation of 18 U.S.C. §§ 1112(a), 1151, 1153. Count Four charged child abuse of his daughter, in violation of 18 U.S.C. §§ 1151, 153, and 21 Oklahoma Statutes § 843.5(a).[5] Count Five alleged assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 1113(a)(6), 1151, 1153. Count Six charged assault and battery on a police officer, in violation of 18 U.S.C. §§ 13, 1151, 1152, and 21 Oklahoma Statutes § 649. Pursuant to the government's unopposed motion, this Court dismissed Count Six on April 28, 2022.

---

[3] *See* Devin Sizemore letter, attached to the PSR.

[4] Mr. Sizemore was originally tried and convicted in state court on charges arising from the same alleged conduct. In light of the Supreme Court's decision in *McGirt v. Oklahoma*, 591 U.S. __, 140 S.Ct. 2452 (2020), that conviction was vacated and the charges dismissed by the Oklahoma Court of Criminal Appeals. *Sizemore v. State*, 485 P.3d 867, 868, cert. denied, 211 L. Ed. 2d 618, 142 S.Ct. 935 (2022).

[5] On October 18, 2022, this Court denied Mr. Sizemore's motion to vacate Count Four.  Dkt. No. 132.

2

Following a four-day trial, a federal jury returned guilty verdicts on Counts Three and Four, convicting Devin of Voluntary Manslaughter and Child Abuse, both in Indian Country. At the same time, the jury returned verdicts of Not Guilty on Counts One, Two, and Five.

The Probation Office filed a Presentence Report on September 5, 2023, setting his offense level at 31 and his criminal history in category IV, resulting in a corresponding advisory guideline range of 151-188 months.

## Discussion

## I. A Sentence of Time Served Satisfies the Factors of 18 U.S.C. § 3553(a).

Under 18 U.S.C. § 3553(a)(1),[6] this Court must consider Devin's history and characteristics and the nature of the offense. These factors weigh in favor of a below-guideline sentence of time-served.

### A. History and Characteristics of Devin Sizemore

Devin grew up in Heavener, Oklahoma, and was raised by his mother, Christina, and stepfather, Mark Sam. Devin has a history of mental health difficulties dating back to his childhood. As a boy, he was diagnosed with attention-

---

[6] After the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the sentencing Guidelines are advisory rather than mandatory. Therefore, in determining a sentence, a court must equally consider the Guideline calculations, the unique characteristics of the defendant, and the other statutory concerns listed in 18 U.S.C. § 3553(a), specifically: (1) The nature and circumstances of the offense and the history and characteristics of the defendant; and (2) The need for the sentence imposed to (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. §3553(a).

deficit/hyperactivity disorder and prescribed Adderall/Ritalin.[7] His hyperactivity caused him to engage in risky behaviors. When he was nine years old, he tried running up a tree to do a back flip, but he fell and hit his head on a rock. He lost consciousness and sustained an occipital skull fracture. He struggled to sit still in school, and more recent testing revealed his IQ was below average.[8] Between his ADHD and below-average intelligence, it's no wonder school was difficult for Devin. He was never provided extra resources, nor was he classified as in need of special education classes.

Throughout Devin's childhood, he witnessed his mother abuse prescription drugs and his stepfather drink to excess. Their home was often filled with rageful outbursts when his stepfather was drunk and his mother was in a drug stupor.

The family moved to McAlester, Oklahoma, when Devin was in middle school. While he was provided with basic needs such as food, shelter, and clothing, he lacked the additional support and resources he needed to thrive in school. His parents loved him, but they had their own addiction problems and were essentially unavailable to help Devin with his school struggles. When he entered adolescence, he experimented with alcohol and drugs. He self-medicated with opiates and methamphetamine.

In 2010, Devin met Margie Harris while they were both in high school. They both used drugs. The following year, Devin dropped out of school. In 2014, Margie

---

[7] *See* Exhibit 1, kindergarten report.

[8] *See* Exhibit 2, Jeanne Russell (2017) report excerpt; and Exhibit 3, Matthew Clem (2021) report excerpt.

became pregnant with Emily. They were still teenagers when Emily was born.

Devin worked menial jobs to earn money and all three of them, Devin, Emily, and

Margie, lived with Christina and Mark Sam. While there is no question neither

Devin nor Margie was equipped to raise a child, Devin was ecstatic when Emily was

born. From day one he was a doting, loving father.





Despite his limitations, Devin embraced his role as Emily's primary caregiver. He fed, changed, rocked, and held her every day. He worked at Komar Distribution Services and Walmart to provide for his family. He also cut grass on the side to earn extra money. Everyone who witnessed Devin with Emily noted that he was a loving, caring father.







No one ever witnessed Devin hit, holler at, or demonstrate any frustration toward Emily. He was patient, loving, kind and always attentive. He always wanted to be around Emily. Prior to her death, Devin vowed to stop using drugs. His intentions were to be the best possible father to Emily, and he recognized his drug use interfered with his parenting ability. Since Emily's death, Devin has dedicated

9

his life to making her proud of him.

### B.   Offense Conduct

On July 15, 2016, 21-year-old Devin Sizemore had lawful custody of his 21-month-old daughter, Emily. In the weeks leading up to that day, Devin had been staying with his grandfather in Heavener, Oklahoma. Emily was with him for part of that time. Larry Paxton, a family friend, took photos of Devin and Emily during their time together in Heavener.[9] Christina Sam, Emily's paternal grandmother, traveled to Heavener and took Emily back to Krebs to celebrate Independence Day with her.

On July 12, 2016, Devin returned to Krebs for a scheduled court appearance and to get his daughter from his mother's house.  Devin could not stay there because his stepfather had an order of protection against him from a domestic dispute. When Devin took Emily back from his mother, Christina voiced concern about his mental stability.

Devin didn't have a place to stay when he left his mother's home. He had to rely on the generosity of friends for housing. Devin and Emily visited with friends and family during their three-day journey throughout Krebs. Margie Harris, Emily's mother, was not actively involved in Emily's life. Devin and his mother, Christina Sam, were primary caregivers to Emily. However, Devin had a close relationship with Sharon Wood, Harris's mother and Emily's grandmother. Devin visited Wood the day before Emily's death. Wood noted Devin and Emily were

---

[9] *See* Exhibit 4, Paxton photos.

happy together.[10]

That same day, Devin ran out of housing options and sought temporary shelter in a barn on the Mouser property. There was a pond right outside the barn. It had been raining hard that evening, and he wanted cover from the storm. Devin's decision to set up camp on the Mouser property was not well thought-out, but he was familiar with the property. He knew Blane Mouser's daughter, and they hired him once to cut the grass.

Devin had been battling mental health issues in the weeks leading up to July 15, 2016. On that day, he was still hallucinating and hearing voices. His family and friends observed his mental health issues in the months and days leading up to Emily's death. According to his mother, he had been talking out of his mind. He was fixated on religious doctrine, which was highly uncharacteristic of him. He was paranoid, falsely accusing his mother of hiding that his real father was his uncle. Christina Sam's concerns about Devin's mental stability prompted her to call 911 and ask that someone check on the welfare of both Devin and Emily. The police began to search for them, knowing Devin was mentally ill.

The barn where Devin and Emily slept had a small area with hay on the ground, and a lantern. It had a door that closed. Devin left Emily in the middle of the night when he heard imaginary voices telling him to ride a horse. He walked to the horse corral,100 yards away from the barn where Emily slept. Devin tried

---

[10] *See* Exhibit 5, Sharon Wood letter.

putting saddles on the horses and when they resisted, he began yelling. His yelling caught the attention of officers who had been looking for Emily and Devin throughout the night. When officers came upon the Mouser horse corral, they noticed Devin and shouted for him to come to them. Devin ran to the barn where he had left Emily. The officers chased him. Devin swam out to the middle of the pond. Emily's little shoes were depicted in two photographs taken by officers – the best evidence to show where Emily was before she wound up in the pond. One of her shoes can be seen on the threshold of the barn door, the other near the wall on the way out. The forensic evidence, supported by Emily's physical condition, confirms she couldn't have been in the water for more than nine minutes. Officers left her face-down for four minutes. Prior to the officers seeing Emily, Devin had been up in the horse corral.

Devin didn't fight with officers. The police bodycam footage tells the accurate story of what happened. When Devin ran from officers and refused to get out of the pond, despite their forceful commands, they became enraged. They lost sight of their main concern, Emily. They discounted Devin's mental illness—the very reason they were sent to find him and Emily.

## C.   Post-Rehabilitative Efforts

Throughout the past seven years, Devin committed himself to self-reflection and becoming a better person. On March 26, 2021, after a lot of hard work, he earned his GED in prison.[11] On January 29, 2021, he was awarded a certificate for

---

[11] *See* Exhibit 6, GED records.

completing a 12-step program.[12] Moreover, he completed a Victim Impact: Listen and Learn course.[13] While in prison, he was evaluated for work duties. He was cleared to work in food service and was a pod orderly. As an orderly, he unloaded trucks, cleaned the work area, and assisted with delivering commissary to the units. Devin's limitations were noted in his prison evaluation for work assignments.

In addition to engaging in extensive rehabilitative efforts, it is commendable that although Devin was originally sentenced to life without the possibility of parole, he's only had one disciplinary infraction. That happened in 2019, when he tested positive for amphetamines and methamphetamines.[14] Aside from this isolated incident, he's been a model inmate. He spends a significant amount of time drawing and crafting.[15] Believing he would never see the light of day, Devin was nevertheless committed to following the prison rules and bettering himself.

### D.    Devin Suffered from Diminished Mental Capacity

A below-guideline sentence is warranted in this case because Devin was not operating within a normal mental capacity at the time of the offense.  "The Supreme Court has expressly held that evidence of mental illness and brain dysfunction are essential components of a defendant's mitigation case."  *Hanson v. Sherrod*, 797 F.3d 810, 835 (10th Cir. 2015) (citing *Boyde v. California*, 494 U.S. 370 (1990)

---

[12] *See* Exhibit 7, 12-step program certificate.

[13] *See* Exhibit 8, Victim Impact certificate.

[14] *See* Exhibit 9, prison disciplinary record.

[15] *See* Exhibit 10, Devin's artwork.

("[E]vidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to . . . emotional and mental problems, may be less culpable than defendants who have no excuse."). Accordingly, "[m]ental-health evidence in particular is some of the most valuable mitigating evidence available."). *Id.*[16]

Evidence of Devin's diminished and altered mental function is overwhelming. His family and friends noted and reported his delusional paranoid beliefs in the days leading up to Emily's death. Devin's mother initiated the welfare check for Devin and Emily because he had been talking out of his mind. Three hours before the officers found Devin, Officer Suter can be heard on his body camera explaining to Christina Sam at her home that they would take Devin to a hospital for an evaluation once they found him. The audio interrogation of Devin is equally telling. The first thing Devin asked Agent Jones was whether God had sent him. Devin's answers to Agent Jones were incoherent and often wrong, including referring to Sharon Wood as Emily's mother. Following the interview, Agent Jones opined that competency was going to be an issue.

On December 8, 2016, for the first time, Devin was evaluated by a psychiatrist and finally diagnosed. Dr. Kelly S. Andrzejczyk-Beatty evaluated Devin

---

[16] The Sentencing Commission has also recognized the mitigating nature of a defendant's mental functioning. For example, U.S.S.G. §5H1.3 states that "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the government." Likewise, U.S.S.G. §5K2.13 authorizes a downward departure to account for a defendant's significantly reduced mental capacity. This Court can impose a below-guideline sentence to account for Devin's mental health as a departure and/or variance.

and concluded that he suffered from major depressive disorder with psychotic features and bipolar disorder.[17] Dr. Andrzejczyk-Beatty prescribed Prozac and Risperdal and Devin's conditions improved.

On July 7, 2017, licensed psychologist Jeanne Russell administered the Wechsler Adult Intelligence IV test. Devin's full-scale IQ scored 68, which is within the extremely low range of intellectual functioning.[18] Four years later, on October 18, 2021, forensic psychologist Mathew Clem again administered the WAIS-IV and Devin's full-scale IQ scored 79.[19] Although Devin's score was higher four years later, he still fell within the below-average range of intelligence.

In this case, Devin suffered from a diminished mental capacity at the time of the offense conduct. At the same time, he was also operating at a below-average range of intelligence. Devin's mental illness caused him to act in a way that he otherwise never would have. Nor would he have put Emily in harm's way.

## II.   Devin's Criminal History is Overstated in a Category IV

Pursuant to U.S.S.G. Section 4A1.3(b), a downward departure is warranted "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes . . . ."

Devin's criminal history is substantially overstated as a category IV.  He was

---

[17] *See* Exhibit 11, Andrzejczyk-Beatty report excerpt.

[18] *See* Exhibit 2, Jeanne Russell (2017) report excerpt.

[19]  *See* Exhibit 3, Matthew Clem (2021) report excerpt.

assessed four points for two *nolo contendere* pleas involving domestic assaults. Both dispositions occurred on March 16, 2017, in Pittsburg County District Court, a year after he had been charged in state court for the instant alleged offenses. At that time, Devin was awaiting trial in a county jail for the state murder charges related to this case. He was represented by appointed counsel Warren Gotcher, who was not representing Devin on the murder charges. It is evident, based upon the simultaneous dispositions, that it was a matter of administrative convenience to clear the court's docket rather than to contest the allegations and properly advise Devin of the consequences of a *nolo* plea. Moreover, his lawyer failed to preserve a jurisdictional challenge to those prosecutions in state court because those allegations occurred on tribal land and Devin is Native American. *McGirt v. Oklahoma*, 140 S.Ct. 2452, (2020). Today, those cases could not be disposed of in Pittsburg County District Court and very likely would not have resulted in four criminal history points.

Moreover, Devin's prior criminal history dates from his late teens and early twenties when he was still maturing and had less impulse control. *See* United States Sentencing Commission, *Youthful Offenders in the Federal System* (May 2017), at 11 (including offenders 25 years old or younger as "youthful offenders" based on "recent case law and neuroscience research in which there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 o average."). Indeed, the Sentencing Commission now recognizes the role youth may have at sentencing. *See* U.S.S.G. App. C., amend. 739 (effective Nov.

1, 2010). Prior to 2010, the guidelines provided age was "not ordinarily relevant" in determining a sentence. *Id.* (effective Nov. 1, 1987). The Sentencing Commission amended the guidelines to permit courts to consider age "after reviewing recent federal sentencing data, trial and appellate court case law, scholarly literature, public comment and testimony, and feedback in various forms from federal judges." *Id.* Accordingly, Devin's prior criminal history is a poor predictor of his risk of recidivism upon his release now that he is approaching 30 years old.

To the extent this Court declines to impose a time served sentence, Devin's instant sentence should be adjusted to account for the time he served on his state sentences. On November 13, 2018, Devin received a sentence of time served for his 2014 state stolen property and drug offenses. PSR ¶ 40. Because those offenses had been continued several times while Devin's state murder offense was being resolved,[20] his time served sentence ran to 28 months' imprisonment, far exceeding the length of sentence Devin would have received for a non-violent first offense. Moreover, the 28-month time-served sentence was imposed after Devin had just been sentenced to life in prison following his state murder convictions. Accordingly, imposing a time served sentence was simply a matter of administrative convenience.

### Conclusion

Based on the foregoing considerations, a sentence of time served is sufficient,

---

[20] *See State of Oklahoma v. Devin Warren Sizemore*, No. CF-2014-00178, Docket Sheet, available at https://www.oscn.net/dockets/GetCaseInformation.aspx?db=pittsburg&number=CF-2014-00178&cmid=31940.

but not greater than necessary, to satisfy the goals of punishment.

Respectfully submitted,

Lisa A. Peebles
Federal Public Defender
Bar Roll No. 507041
Clinton Exchange, 3rd Floor
4 Clinton Square
Syracuse, New York 13202
(315) 701-0080